THE COMMERCIAL BANK *vs.* SAMUEL LOCKWOOD'S Adm'r.

On the dissolution of a corporation, as by the expiration of the period of its charter, its
real estate reverts to the grantor; its personal estate vests in the people; and the
debts due to it are *extinguished.*
It is not in the power of the Legislature, by renewing the charter, to revive the liabili-
ties to the corporation.

SCIRE FACIAS on a judgment.

The Commercial Bank obtained from the Legislature of Delaware
in 1812, a charter which was to continue till 1st. September 1822.
In February 1822, the charter was extended until 1st. March 1824,
to enable the directors to close the concerns of the bank. In Janua-
ry 1834, it was further extended until the 1st of March 1827, for the
same object. In January 1827, it was further continued by an act

of the legislature until March 1, 1830, to enable it fully to close its concerns, and authority was given it to sell at public auction, all debts due it.   This supplement declared that the corporation should continue until the 1st. day of March 1830, *and no longer.*   The first day of March 1830, passed without any further extension of the charter, and the corporation became of course dissolved.   In this condition it remained until the 4th day of February 1832, when the Legislature passed an act " reviving, renewing, continuing and extending the corporation from the first day of March, which was in the year 1830, until the first day of March 1835," and " reviving, renewing, granting, continuing and extending the powers, privileges, rights and immunities" *theretofore granted* the said corporation, for the same period, to be used only for settling and closing the concerns of the corporation.   The transactions and doings of the bank and of the individuals composing or representing it, and of third persons against it, or those composing and representing it, which had been transacted since the 1st of March 1830, were declared by that act to be as valid in every respect, as if they had been done while the corporation was in existence.   In February 1835, the corporation was by a further supplement continued until 1839, for the sole purpose of closing its concerns.

A judgment was entered by and in the name of the corporation, against Samuel Lockwood, on the 28th of May 1827, and the present action was one by scire facias to revive that judgment.   No proceedings were had on the judgment between March 1, 1830, and February 4, 1832.

The pleas were:—1st. Nul tiel record.   2d. Payment by Samuel Lockwood, in his life time.   3d. Payment by his administrator, this defendant.   4. Ple ne administravit.   5th. Plene administravit præter. 6th.   A special plea, stating that the act of incorporation of the bank limited its existence to the 1st September 1822; that the same was extended by several supplements until the 1st. of March 1830, and no longer.   That the judgment in the scire facias mentioned, was recovered by the said corporation on the 28th May 1827; " that the several days and times in the aforesaid several acts of the said General Assembly mentioned, during and within which the existence, duration and continuance of the said corporation or body politic were confined, circumscribed and limited as aforesaid having fully elapsed, transpired and become completely ended, to wit: on the 2d March 1830, the said corporation or body politic thereupon and thereby ceased to exist, and became and was extinct and dissolved ; whereby the judgment aforesaid and the debt, damages, costs and charges

aforesaid became and were extinguished and discharged, to wit: on the day and year last aforesaid, at the county aforesaid."

The plaintiff replied generally to the first five pleas, and in the replication to the sixth plea, set out the act of assembly passed 4th. February 1832, reviving, continuing and extending the act of incorporation until the 1st March 1835; and also another act passed 3d February 1835, continuing the same until 1st March 1839. To this replication there was a demurrer.

*Frame* for defendants, in support of the demurrer contended, that the expiration of the charter on 1st March 1830, worked a civil death to the corporation; it became dissolved, extinct and gone—and that it was not in the power of the legislature, by a subsequent act to re-animate this dead body. That by the civil death of a corporation, every debt due to or from it ceases to exist, is discharged or extinguished; and that it was not competent to the legislature again to give efficacy or obligation to any such debt or contract. He cited 1 *Black. Com.* 484; 2 *Kent Com.* 307-9; 3 *Term* 199; *Hobart* 10; 1 *Salk.* 302; 1 *Kent Com.* 554.

*Huffington* contra, argued that in relation to matters of legislation not especially restricted by the constitution, our legislature is as omnipotent as the British parliament; and he undertook to show that parliament, or even the king's letters patent had been held sufficient to revive a corporation that had been dissolved by efflux of time, a failure to elect officers, &c. 3 *Term Rep.* 199, 242; 3 *Burr. Rep.* 1866; 1 *Kent Com.* 448. If there be no constitutional objection to a statute, it is as absolute as in any government. The legislature has an omnipotent power to do right. And our legislature has passed retrospective laws, such as acts legalizing unlawful marriages; dissolving marriages; declaratory of the existing law; repealing repealing acts; for the limitation of actions, &c. &c. 16 *Mass. Rep.* 245, 270. The legislature passed a general law extending all corporations for three years. The Essex Bank did not accept it, but dissolved themselves. Held, that they still existed under the general act and might be sued. And if after the charter expires they may be sued, they may also sue. 4 *Wheat.* 435, 122.

*Frame* in reply. In the case from 16 *Mass. Rep.*, the debt had never been extinguished. The action of the legislature was only on the *remedy*, and is similar to an act of limitation. Both debt and remedy are here gone. A corporation may become *virtually*, though not actually extinct or dead, as on a failure to elect officers, and in such case either parliament or the king may renovate a dormant, or suspended existence, but not create anew one that is absolutely dead. This is the extent of the cases cited.

*Curia advisare vult.*

Mr. *Justice Black*, delivered the opinion of the Court.

A single question is presented for the determination of the Court by the pleadings in this case—whether the Commercial Bank can reco‐ ver from the estate of Samuel Lockwood, the amount of a judgment which was due to it by the intestate, on and prior to the first day of March 1830, or whether that judgment by the dissolution of the cor‐ poration on that day, was not extinguished.

If the debt which Lockwood owed the bank be lost to the corpo‐ ration or the individuals composing it, it is the result of the conduct of those to whom its interests were entrusted. They were aware that the existence of the corporation, and all its rights and powers, were to cease on the first day of March 1830. This was fixed and known as the period of its dissolution, and the obligation of active diligence in closing its concerns, by enforcing the payment of debts due it, or by a sale and transfer of those debts, (and for which spe‐ cial purpose its charter had been extended) became imperative. If further time was necessary to enable it to adjust its concerns, it is presumed it might have been obtained, if asked for, when the General Assembly met in January 1830. If by neglect on the part of this corporation or its trustees, of an obvious duty, an established princi‐ ple of law interposes to bar a recovery by them of a debt once due from the intestate of the defendant, and which it is admitted has not been in fact paid, the fault is not to be imputed to the law, but to the supineness or neglect of the corporation, or those who were its re‐ presentatives. It was known to them, that all its corporate powers and privileges would cease at its dissolution. That it could neither sue or be sued—that it would be civilly dead, and that those legal principles which apply to dissolved corporations, and their lands, goods, chattels, rights and credits, would at once attach and operate upon the real and personal estate, and rights and credits of this in‐ stitution. They had the alternative of collecting or transferring the debts due them before the corporation was at an end, or of permit‐ ting them to remain uncollected till that period arrived, then to be affected by the legal principles which belong to cases thus situated. In relation to the debt now in controversy, the latter alternative was adopted, either with a knowledge of the law, or with the means of such knowledge, at their command. If they suffer a pecuniary loss, it is from their own laches, and there is no hardship.

On examining the cases cited in the argument, and others to which our research has led, there would seem to be little if any doubt as to what is the law in relation to debts due to a corporation, when the existence of the corporation is admitted to be at an end. The ques‐ tion of difficulty appears to have been the ascertaining whether it

was absolutely dissolved or merely dormant—whether it was civilly dead, or only disabled and incapable of action, or of exercising its functions, from the want of some limb or member.   This was the important point to be fixed in the cases which were read from 3 *Burr.* 1866; of the *Mayor, &c. of Colchester* vs. *Seaber*, and of the *King* vs. *Pasmore* in 3 *Durn.* and *East.* 199 :—they were both cases of incorporated towns, possessing the power and means of perpetual succession ; but which succession they had failed to continue by an election of officers according to their charters, and therefore, became unable to act or proceed as a corporation from the want of officers.   Such a state of things produced not an *absolute*, but a *quasi* dissolution.   The corporation became, as was said by Lord Kenyon in the *King* vs. *Pasmore, dissolved to certain purposes.*   It was so far dissolved by its disabled and inactive state, as to justify the crown in creating another corporation in its place, if the king did not think proper to revive it by his letters patent.   The corporation had become dormant virtually, though not actually dead—capable of being revived, but incapable of action without such revival.   Its life or death rested with the *crown.*   The king could impart full and active life to the old corporation by reviving it, or inflict perfect civil death by supplying its place.   Letters patent of revival would restore to it its active powers, set the machinery in motion, and enable it by its restoration of active power, to prosecute its rights and recover its debts ; a power which had been suspended while the corporation remained in its dormant or quasi dissolved state.   In the case in 3 *Burr.*, it was held, that the corporation had not become actually dissolved, and that by the letters patent it was revived with all its rights and powers.   In the case in 3 *Term*, the old corporation was held to be so far dissolved, as that the crown could grant a new charter, and that this new corporation took the place of the old one, and the latter then became fully dissolved.

The companies which have been created in this State with banking powers, are corporations very different from the incorporated towns in England.   They are the mere creatures of the law, deriving their existence and all their rights and powers, either expressly or incidentally, from the law creating them.   *Perpetual succession* is not one of their attributes.   In their charter the days of their existence are numbered, and the very period of their dissolution fixed.   If the charter be not extended, the very moment that period arrives, the corporation stands, not *dormant*, disabled, or incapable of action merely, but *absolutely dissolved*, civilly dead, without life or being, and altogether at an end.   Their condition when their charter has expired, is not therefore the same as that of the incorporated town,

which has failed to elect its officers, and as the consequence of that failure, is rendered inactive.   The life of the one is out by its own constitution, and not from a failure to do what their charter enabled them to do, to give them active being ; the other was entitled by its charter to a continued active life, but it has failed to continue that activity by the election of its necessary officers—its active powers, but not its being, are gone.   The one is dead, the other is dormant.   The principles of law which apply to the rights of a corporation thus dormant or disabled, are not the same as those which are applicable to the rights of a corporation which is dissolved or civilly dead.

If the fact of dissolution, *absolute dissolution,* be admitted or established, there would seem, from the authorities which bear on this point, to be no question as to what becomes of the estate both real and personal, and of the rights and credits of the corporation.   The text books and cases decided are uniform in their language—that the real estate held by the corporation at its civil death, reverts to the grantor and his heirs—that the personal estate vests in the people, or in England, in the crown, and that the debts due to and from the corporation are totally extinguished, so that neither the stockholders nor the directors or trustees of the corporation can recover or be charged with them in their natural capacity.   *Levinz* 237 ; *Owen* 73 ; 2 *Anderson* 107 ; 1 *Blackford's Indiana Rep.* 267 ; 2 *Bacon's abr.* 32 ; 4 *Comyn's Digest* 273 ; 1 *Black. Com.* 484 ; 2 *Kyd on Corp.* 516 ; 2 *Kent's Com.* 307-9 ; *Angel and Ames on Corp.* 513.

Lands and tenements and goods and chattels are matters of substance—they are tangible—they have not merely an ideal being, but an actual existence, although they may be without an owner in being or in expectancy.   It is not essential to their existence that they should have an owner ; they pass on the civil death of a corporation from its hands, but are not annihilated ; they still exist and continue in being, and may be occupied and used by those who may take possession of them : as they retain their being and remain the subjects of occupancy and possession ; the grantor of the lands can lay hold of them, and the State through its proper agent, can take possession of the goods and chattels which belonged to such corporation.   But such is not the character or condition of debts owing to such corporation—they are merely rights—things incorporeal, which rest in action—they have an ideal, but not an actual existence—they are neither tangible, nor the subjects of occupancy or possession.

In all the books which treat of the effects of the civil death of a corporation, debts are considered as not within the terms *personal estate,* or as embraced within that general class, but when spoken of are distinguished from personal estate.   They do not pass to the peo-

ple in this country, nor to the crown in England, as is the case with the *personal estate*, that is, the goods and chattels; nor could the State or crown recover them by suit upon the dissolution of the corporation. They have not, like real or personal property, a necessary existence. It is essential to the continuance of that existence which belongs to their condition, that there should be either in actual being, or in expectancy, with the possibility of an actual being, *two parties*—one to do, and another to accept the thing to be done—a debtor and a creditor—a payer and payee, and if the debtor or creditor, payer or payee, dies a natural or civil death without a representative, or the possibility of a representative, the debt ceases to exist, and the obligation of payment is forever at an end.

When, therefore, the Commercial Bank by the positive provision of its continued charter had, after the first day of March 1830, ceased to exist, and was then dissolved without either a representative or the possibility of one, as no provision is made by our laws for a representative in such a case, the debts due to it became, at the instant of its dissolution in the emphatic language of the law *extinguished*— not the right to, or remedy for the debt suspended merely, but the debt itself annihilated.

When the law speaks of a right or obligation as *extinguished*, it means, that it is put out, taken away, destroyed. *Coke Litt.* 147. *b.* 1 *Rolles abd.* 933. If one has a rent charge, and buys the whole or a part of the land from which it issues, the rent charge is thereby *extinguished.* It cannot be revived, and the land is forever free and discharged from it. *Coke Litt.* 148, *a.* If a creditor accept from his debtor a security for his debt of a higher grade, the law holds the original debt to be *extinguished.* It is at an end and can never be sued on. *Yelv.* 38; 6 *Coke* 44, *b*; *Powell on Cont.* 254; *Peters' Cond. Rep.* 290, in notes. At common law, if a creditor makes his debtor his executor, the debt is *extinguished,* and will not revive on the subsequent death of such executor. 1 *Atky.* 461.

These, and a variety of other cases that are to be found in the books, illustrate the meaning which the law attaches to the term *extinguished;* that is, that the right, obligation, or whatever else is declared to be extinguished, is taken away, put out, destroyed, annihilated. Its existence is gone, and it cannot be restored or revived. By *contract* or *with the assent* of the parties, a new right or obligation of the same character may be enacted, whose validity would be derived from the new agreement, and not from that which had been extinguished, as its obligation was forever gone. But it may well be questioned whether a *debt,* (the legal acceptation of which is a sum of money due by *agreement,*) can be created by mere legis-

lative enactment; for it is a contract, and it is of the very essence of a contract, that there should be mutual assent, that the party to be bound should consent to whatever is stipulated; for otherwise, no obligation would be contracted or concomitant right created.

In 1 *Blackford's Indiana Reports* 267, we have a decision by the Supreme Court of Indiana, as to the legal consequences of the dissolution of a banking company, on its property and debts, and which is in entire accordance with the views we entertain. An information in the nature of a quo warranto had been filed against the State Bank of Vincennes, and after a hearing, the Court gave judgment " that the privileges, franchises and liberties of the company be seized into the hands and custody of the State, together with all and singular, their goods and chattels, rights, credits, and effects, and also all and singular, their lands and tenements." The case was taken by a writ of error, to the Supreme Court of that State, who sustained so much of the judgment below as authorized a seizure of the franchises into the hands of the State, but reversed that part of the judgment which authorized the State to seize the lands and tenements, goods and chattels, rights and credits of the corporation. They held that the lands of the corporation reverted to the grantor and his heirs, and its goods and chattels became vested in the State, at the moment of the civil death of the corporation; and that the debts due to and from it were extinguished by the dissolution, so that it was impossible in the nature of things to seize the rights and credits, because their existence ceased at the instant the claim of the State accrued, which was the instant the corporation was dissolved; and at that instant the debts were extinguished and had ceased to exist. The forfeiture of the charter and the seizure of the property and debts were decreed by the Court below in one and the same sentence. The seizure of the lands, goods and debts was based upon, and was a consequence of the forfeiture; they were to be seized because a judicial forfeiture of the charter had been decreed; but notwithstanding this, the Supreme Court decided that the judgment to seize the debts, thus given in the same breath with that of the forfeiture could not be sustained, because the debts were extinguished and forever gone, at the moment the corporation was dissolved, and that they could never be recovered by the State by suit.

The Commercial Bank stood dissolved from and after the first day of March 1830; the debt which is now sought to be recovered in this action became then extinguished. The legislative act of 1832, declaring the corporation to be revived and continued from the 1st. of March 1830, with the same powers, privileges, rights and immunities, which had been granted to it by its original charter, will not

enable it to sustain a suit for the debt in controversy, inasmuch as the design of that act was, not like the letters patent of the king to which we have referred, to renovate and set in motion a dormant or disabled corporation, but to revive and renew, or rather to re-create a corporation that had been for months absolutely dissolved and civilly dead ; and by the well settled principles of law, this debt was *extinguished* on the day of the civil death of the corporation, and all indebtedness and obligation on the part of the defendant was then legally at an end, and the debt could not be re-created, except in the same way that the original debt had been created—that is, by mutual agreement.

According to our apprehension of the case of the *Mayor of Colchester* vs. *Seaber*, cited by the counsel for the plaintiff, from 3 *Burr.* 1866, it is not in conflict with the conclusions to which our minds have been brought, but the reasoning and views of the judges in that case, are in accordance with those conclusions. The Court there allowed the revived corporation to recover the amount of a bond given to the original corporation, on the express ground, that the corporation had never been actually *extinct* or *dissolved.* They held that it retained its constitution, and was only *dormant* and *inactive,* and that therefore, the debts due it were not extinguished. Lord Mansfield said he was clear upon principles of law, that the old corporation was not *absolutely dissolved* or *annihilated,* although they had lost their magistrates, and that by virtue of the new charter, they were so revived as to be entitled to the credits, and liable to the debts of the old corporation ; but, he adds, "when there is a judgment against the *corporation itself,* (the judgment in the case of that corporation had been one of ouster against the officers only,) the case would be of a different consideration." The plain meaning of Lord Mansfield in these expressions is, that if the judgment against the old corporation had been one *dissolving* it, and not merely for the removal of those who claimed to be its officers, the new charter would not have enabled the corporation created or revived by it, to have recovered the debts due the old corporation.

From the language used by the different judges in giving their several opinions in that case, the inference is one not to be resisted, that if they had considered the corporation dissolved and civilly dead, prior to the grant of the new charter, they would not have permitted the debt in that case to have been recovered by virtue of the new charter, but would have pronounced it to be extinguished by the dissolution of the corporation to whom the obligation had been given.

The principles and reasoning in this case in our view, directly sustain the position, that a corporation if once absolutely dissolved,

though it may be afterwards revived or re-created, cannot recover the debts which were due to it at the time of its dissolution.   To hold otherwise, would be to unsettle principles which have been established and recognized for ages.   The Commercial Bank, from and after the first day of March 1830, was by the express terms of the acts which gave and continued its being to that time, not a dormant, inactive, or disabled corporation, but one that was then dissolved and civilly dead, to every purpose whatever; its elements were then disunited and separated, and it therefore follows, that the debts then due to it were extinguished, and are of course lost to those who composed the corporation.

The act of 1832, reviving the Commercial Bank, does not undertake to enact that the *debts* which were due to it, and which had been for nearly two years extinguished, should stand *revived* and be recoverable.   It is argued that this is a necessary consequence of the revival.   The act, however, goes no further than to provide that the corporation should be revived and continued from the first of March 1830, with the same "*powers, privileges, rights and immunities*" which had been *theretofore granted* to it.   It again possessed all those powers and rights which the original charter had given to the company; but debts were not given or created by the original charter, but only a corporate power or capacity to contract or create debts: they might and could arise as a consequence of the charter, but did not and could not come into being with it.   In reviving the "*powers, privileges, rights* and *immunities*" of this corporation, which had been originally granted to them, it is sufficient for us to say, that the legal effect and necessary consequence of the general provisions of this supplement, are not such as to revive or re-create, or give life and obligation to the debts which were due the bank at its dissolution, or to vest in the present institution authority to enforce their collection.

It is unnecessary for us at this time, and with our views of the character and terms of this reviving supplement, to decide whether, if by that supplement the debts due to the corporation had been in express terms declared to be revived, again in force and recoverable; or whether as a correlative of that position, the debts due *from* the corporation might, on the application of its creditors, months after its dissolution, by a legislative act, without the assent of the members of the company, be declared to be revived and recoverable:— such enactments would have been within the legitimate sphere of legislative action in this state.   Whether the power to create a debt, which is understood to be a matter of contract and of mutual assent, is one which belongs to the legislature of a state, the citizens of which have secured to them by constitutional provision, a republican and

not an arbitrary or irresponsible form of government, or whether such a power is not one against common right and reason, and in violation of those great primary and fundamental principles of liberty, right, and natural justice, upon which all legislative action in a republican government, is understood and assumed to be predicated.

The demurrer is therefore sustained, and judgment must be entered for the defendant.

*Huffington* for plaintiffs.

*Frame* for defendant.

